Your Honor, the second case of the morning, call 209-529, Stanton v. Knutte. That's all on behalf of the appellant, Mr. Bob Lang, and on behalf of the attorney, Mr. Thomas, calls the court. Thank you. Mr. Lang, good morning. May it please the court, counsel. Basically, the case is somewhat complicated legally, but factually what happened here is a general partner sold the limited partnership's main asset secretly to his son for his personal benefit. And the trial judge held that as a matter of law, despite this general partner's burden of proof by clear and convincing evidence, given the presumption of fraud, that that sale was fair as a matter of law. Did they have an obligation under the contract to disclose any sale? Not under the contract, Your Honor, no. But our argument is that, based on the Dolan cases and other cases, that fiduciary duties lie outside of the contract, also under the Uniform Limited Partnership Act. The general partner cannot contract away his fiduciary duties. And there's that one section, 110B, where advanced disclosure to all limited partners of all material effects relating to a transaction must be given. But didn't this fiduciary duty arise from Knutte's relationship as general partner to Stanton as the limited partner? And doesn't the limited partnership agreement control that relationship? In other words, who has an obligation to do what with respect to whom? The Dolan case basically says that the limited partnership agreement is a guideline, but it's not the be-all, end-all. And in that case, the reason we do rely so heavily on the case is it's so factually similar. In that case, the general partner was making the exact same arguments. He had this unfettered discretion to decide how much the limited partners get for their income tax distributions. And clear enough, by the letter of the agreement, he should have won that case. But the Dolan court held that we have to look outside the agreement. It's not the be-all, end-all. And they went to Justice Cardozo and cited all these inveterate and unbending rules of law that the managing general partner especially has the highest duties under the law. Do you agree that they have to prove some type of damage as a result of the breach of the fiduciary? Pardon me, Your Honor? Do you agree that damages must be proven? In other words, you just can't prove a breach of a fiduciary duty and win the case when there are no damages. Well, we do have a declaratory judgment count, Your Honor. As to our breach of fiduciary duty count, yes, we did. This is a summary judgment case, correct? Yes, we lost a summary judgment. And the judge found that there was no – the primary issue in your case regarding damages is that the building should have sold for much more than it did. That's the primary issue, although we do question even selling the building at that time. For example, the building could have been refinanced. Now we're talking about 2007, 2010, so it might not make much sense. But at the time, there could have been favorable interest rates for the limited partners to keep the building, take some money out of it, and refinance it. But Mr. Kennedy, as the evidence showed, sold the building for his personal benefit. He was about to retire. He said he wanted to sell it at that time because he wanted to be done with it. Well, we're talking about selling the building. It doesn't matter who you sell it to. If that's – yes, that's correct, Your Honor. But we have a problem with how it was sold. But didn't the general partners ratify that sale? I mean, they didn't object to it. There was one other general partner, and he did, after the fact, say that he agreed to the sale. We took his deposition. He absolutely said that. There's a conflict between two provisions of the contract here. Paragraph 5 is kind of a generic provision that we see in a lot of these form agreements that gives the general partner all the powers under the sun that he or she could have. Paragraph 7a of the Limited Partnership Agreement applies specifically to the sale, and it says that all the general partners have to determine the purchase price before the sale. And that didn't happen. This other general partner, Mr. Bresnahan, yes, after the fact, he said, I agree with what Mr. Kennedy did. But before the sale, he did not determine the purchase price. But who has standing with respect to that? The limited partner, the general partner? With respect to? To 7a. Because 7a applies, in my reading, to general partners. That's correct. Absolutely correct. But we say that that was still breached because Mr. Bresnahan did not determine the purchase price before the sale. That's undisputed. He came in after the fact. In paragraph 5, that talks about ratification, and the general partners basically have a veto power to override a decision. And that undoubtedly, that's the record, that did not happen here. And how about the purchase price? Well, the purchase price, we had an appraiser who came in, and this is another property of the trial judge. He basically weighed the credibility of the experts and found that their appraisers were right as a matter of law. Our appraiser came in at $3.6 million as of the date of the sale, and the purchase price was $2.315 million. So it was a $1.3 million spread. And the trial judge held as a matter of law that the purchase price, the $2.315 million purchase price, was fair as a matter of law. And as you can see, even in the appellee's response brief, they look at the credibility of our experts' report. There's this issue of whether the bathrooms in the building were renovated before or after our expert conducted his inspection for his appraisal. Right. There were extensive renovations done. Yeah, but the problem with that is our expert did his inspection in January 2009 when we took the depositions of Mr. Community's sons. They testified that the renovation of the bathroom was still ongoing in February of 2009. So there's a question of fact as to whether that renovation was still going on. But the appraisal itself was actually done not at the time of the sale but two years afterwards, wasn't it? It was, but the appraisal date was March 7th of 2007. So as appraisers can do, they went back and looked at comparables around that time and so forth. So moving on, the other issues we have, I think we've raised the issues of fact. But Mr. Community did undersell the property, at least there's a question of fact of that. We have our expert's appraisal. We have the loan to value ratio, and this was over 100%. There was no marketing of the property, not even a for sale sign outside. There was no use of brokers. And here's a problem we really had with this. Mr. Community said to his sons, I'm going to put this piece of property on the market after I give you the private first shot at it. So it's not like they're trying to save money on brokers, even though one of the general partners or the other general partner was a broker. But there was nothing in this agreement that required the general partner to do any of that, was there? Correct. This is, again, we're going outside. We're looking at the general fiduciary duties. I mean, we didn't find a case that says that the limited partner has to list the property for sale before selling the building. But we're looking at the duties of our own. The managing partner. Yes, I'm sorry. The managing partner. But if he's trying to get the highest price for the best interest of the partnership, why didn't he do that? Isn't that the best way to give some competition to his sons? Why, for example, we have in the record this general partner asked. Remember, the general partner set the purchase price by these appraisals. Well, he asked the appraiser, one of the appraisers, for a valuation reduction, for a reduction of his appraisal. So let's just think about that for a second. The seller of a building is asking for a reduction in the purchase price. Does that make sense? And also, there was no negotiation even with his sons. So why couldn't you have gone back to the sons and say, well, the appraisers came in at 2.3, but I think it's worth more. Let's look at some comparables and so forth. Also, one of the other issues of fact is that Mr. Kanuti sold this building for his personal benefit. Their accounting firm, the sons of Mr. Kanuti's accounting firm is the main tenant of this building. And by virtue of their purchase of it, they were able to be the landlord and the tenant. Mr. Kanuti, like I said, basically said he wanted to be done being the general partner. Well, if you want to retire from being a general partner, the way to do that is not just to sell the main asset. The way to do it is to resign as a general partner and see if somebody else wants to do it. Also, another issue of fact here is the secrecy. Remember, they have a duty of honesty. The manager general partner has the highest and unbending duty of honesty. And, of course, before the sale, he gave us no advance disclosure of what he was going to do. Even after the sale, the first notice we got was a handwritten letter that said, I sold the building. Here's your check for your 9%. It didn't say who the building was sold to, what the closing date was, or what the price was. So the concealment even continued after the sale. Did your client ever ask for a more detailed statement? We did after. Did you ever obtain one? We got one, yes. We got one in May. And we eventually got the closing statement and so forth through discovery. We were able to discover everything. But then there's the other suspicious circumstances. The same attorney represented the buyer and seller in that transaction. And so, not trying to say anything bad about counsel at all, but that could have been a nice safeguard for our client. Really, nobody was looking after the limited partners in this whole transaction. Well, but now, if I go back to the standard against which we measure the conduct, there isn't anything in the Dolan case or any other case that says that the fiduciary duty that's outside of the limited partnership agreement supersedes any obligations in the partnership agreement, is there? I mean, Dolan doesn't say that. They say that the fiduciary duty exists concurrently with the obligations set forth in the partnership agreement, whether or not expressed in there. Isn't that correct? That's not the way I read Dolan, Your Honor. Well, I mean, that's exactly, I've just paraphrased the language in Dolan. And the trial court actually found that there was no breach of fiduciary duty. I mean, the court being aware of and indicating in its decision that it was aware of the separate obligations of fiduciary duty and the obligations of the partnership. Well, let me restate that. I think what it is is the breach of fiduciary duty here is a gap filler. So when you ask, are there terms in the contract that say you had to list the property or you had to give the advance disclosure to the limited partners, no, there aren't those terms. There are terms that say that he doesn't have to do that either. The breach of fiduciary duty, like the implied duty of good faith, is a gap filler here. The other issues in the case, it was complicated procedurally, and there were several motions to dismiss. But the main show here is the sale of the building and the summary judgment. And at the end of the day, we think that we just should have our day in court on that. I think there are issues of fact. Yes. Did you say the price of the building was the relevant issue of fact? That the court erred in finding as a matter of law that the price was a fair and reasonable price? That was one of them. The other issues of fact were the ones I raised. Let me just look at the trial court's ruling again. Go ahead. Price is a substantially disputed fact relative to the judge's ruling. He argued that. Yes. Oh, yes. And he, if I could read from the judge's ruling, he held that the evidence shows that the property was sold for fair market value as calculated by more than one independent appraiser prior to the sale, and by another independent appraiser after the sale. That's at C709 of the record in 710. So that was very heavily in his decision. And your appraiser testified it was quite a bit more. Correct. And that's okay. Okay. Thank you. Okay. Thank you, counsel. Mr. Falkenberg. I'm a police court counsel, Tom Falkenberg, on behalf of my community and the remaining defendants. I'd like to start off and address the issue of the price because the price obviously is a substantial issue in this case. But the issue is not only was the price, the sales price, fair and reasonable and fair market value of the property, but we have to take this in the context of the case in which we have here. We have a breach of fiduciary case. We do not have a situation where Mike Canutti, who is an accountant, in theory he can go out and value a property. That's what accountants do from time to time. This is not a situation where Mike Canutti went out and valued the property. If he did that, we would have a different set of circumstances. And under those circumstances, I would argue to you that the issue of their expert's price comes more into play in this situation because the question then is using his professional standard of care as a valuation person, putting that hat on, did he properly value the property? And if he didn't, is their expert's valuation something that's more reasonable? Is there an issue as to the value of the property based upon these renovations? Is that one of the issues? That is an issue to put it into context, yes. And I'll address that now. The issue in this case is as managing general partner, did Mike Canutti breach any duty by selling it for the hire of the two appraisals? And I'll answer your question in context of all of the appraisals. There was just not one independent appraisal beforehand. There were two. And it's extremely important in this case because it's a breach of fiduciary duty case, not negligence in performing the valuation. In a breach of fiduciary duty context, Mr. Canutti had an obligation to go out and determine what the fair price was. Nobody, including the plaintiff, is alleging he couldn't sell. There is some question about the timing, and I'm not even going to address that because I don't think that merits discussion, whether or not you ever have to sell a property. So he has to determine the price. He didn't perform the valuation himself. He goes out and has experts do it for him. Is that reasonable? I believe yes. I think we would all agree. That is reasonable to have a managing general partner go out and get an expert to conduct the appraisal. He went out and had an independent appraisal performed, and it came back at $2.3 million, the first one. This was, I believe, in October of 2006. There was the issue of Mr. Canutti raising the renovations and suggesting that maybe a fair cost for that would be $100,000. What do we have in this situation? We have that appraiser, Mr. Kenny, saying, I ignored that. I didn't take that into account. I appraised it at $2.3 million. I didn't factor in any renovations. So that red herring is now out of play based on the facts, the uncontroverted facts before the court. So we have a $2.3 million appraiser. Mr. Canutti then goes to his sons, who are the biggest tenant in the property, and the facts and the record are that they have half of the second floor. It's a two-story building. The other tenant on the first half happens to leave right about this time period. Canutti and Associates is a growing accounting firm. It's bursting at the seams. They have to find other space. Now there's an opportunity because the tenant on the other side of the second floor leaves, they can expand and stay in that building. So Mr. Canutti approaches his sons, who run the Canutti and Associates business that Mr. Canutti is now retired from, and says, here's an opportunity for you. Would you like to have the entire floor? I know you have to move. Would you like to have the entire floor? Is that a sweetheart deal? I will represent to the court, no. It benefited Mr. Stanton. It benefited Mr. Canutti. It benefited every single partner because he didn't have to go out and market it. What has been omitted from the record thus far in the argument is that in the past there have been attempts to market the property. There have been attempts to lease the property. It was not a good market at the time. It's worse now. If we would have held on to it, where do you think we'd be today? We'd be facing a separate lawsuit. So he approaches his sons and says, here is an independent appraisal. I will give it to you for $2.3 million. No negotiation because that's the value. We all know what happens generally in business in this circumstance. There's negotiations that take place. An appraisal is an appraisal. You negotiate off that for various reasons. And it may be beneficial to both sides to sell it for $2.0 million or $2.1 million. Here he said, no. I owe it. And his testimony, his uncontroverted testimony is, I did it to be fair to my partners. That was the appraised value. If my sons were going to get it, they were going to pay the full amount. So what happens after that point in time to determine, to get to this issue, did he or did he not breach the fiduciary duty? The sons go out and get a bank loan. There's issues brought in the record. I hope we dispel those in our briefing about whether or not it's questionable because the bank appraised it at $2.1 million yet gave them 100% financing. I think the record is very clear that they gave them 100% financing because they put up the community and associates have more than 40 professionals. It is a large accounting firm. They put up the entirety of their accounts receivable and security. The four sons put up their homes. They signed personal guarantees. Under that scenario, the bank decided, yes, this is a good risk. We've got essentially everything these four gentlemen own plus a building as collateral. We'll give you that loan. But the important point about that loan and getting to your question, Your Honor, is that it came back at $2.1 million. Now, as part of this record, we have the deposition testimony of all of the sons. They clearly stated they were upset. They went back to their father and said, Dad, you're selling that to us for $2.3. It's only worth $2.1. We want to pay $2.1. And the father said, No, not only are you paying the higher of the two, you're also going to have to pay $15,000 because on our existing note, there's a prepayment penalty. $2.315 was the final purchase price. The highest appraisal was $2.3. The more recent appraisal was $2.1. Why is all that important? Why do I stress that for so long? Because, once again, Mr. Comuni wasn't valuing the property. He was a partner, and it was his obligation to rely on information to determine whether or not he's breaching a duty. This is what the court saw. This is what the court evaluated. This is what the court decided. It was a fair price. What is a partner supposed to do? He had gone out and got two appraisals, two separate appraisals, and he went with the higher of the two. Could they make an argument, which they have made, should have got three, should have got four, should have got ten. The question is, did Mike Comuni act reasonably? Did he breach a duty by only getting two and using the higher of the two? Here's my question. Everything else being equal, was it the duty of the general partnership to get the highest price, the reasonable price he could for that property to benefit the? Very simply, no. The obligation was to get fair market value. A bona fide purchaser. Earlier we heard some questions about whether or not the limited partnership agreement controlled. If the fair market value is a million dollars and somebody comes to the general partner and says I'll offer two million dollars or a million above the fair market value, everything else is equal. Yes. If the general partner took the one million dollars, that wouldn't be a breach of fiduciary duty to the other partners who? In that circumstance, Your Honor, I would agree with you. Okay. Okay, now let me get to my next question. Okay. There was testimony from the defense side that the property was worth $3 million, so $900,000 more than the appraisal, the so-called appraisal obtained by the community. Wasn't that a substantial question of fact or lies at that point in time regarding the fair market value of the property? And the judge in making, deciding the case on a summary judgment decided, number one, that the two appraisals were the more fair appraisals. Then there was a material question of fact involved in what the fair market value was. No. And here's the reason. For all the reasons I stated earlier, if it was a situation where a community was going out and was the evaluator, yes. But in a situation here with a breach of fiduciary duty, we say, based on the information you had, you had two independent appraisals. Is it reasonable for a, or let me put it the flip side, was it a breach to rely on those two appraisals? Because we don't look in the context, could you have gotten another one that was higher? In a litigation setting, we know what's going to happen. They're always going to get an appraisal that's higher. The question is, at the time he acted, did he breach a duty? And that's why I wanted to stress so thoroughly before about valuation hand-on or fiduciary duty managing partner hand-on. To answer your question about if there was somebody at the time that would have paid more, I agree there. That wasn't the facts before us. The facts before us are, the vetter came in. Was it fair and reasonable? Yes, we believe it was fair and reasonable. And he took that price because it benefited everyone. They didn't have any marketing expenses. They didn't have any languishing. They didn't have to incur any debt. They didn't have the rent not coming in because communities were going to leave if they didn't get ownership interest. Because the testimony is uncontroverted. They wanted to buy their own business, their own building. They're businessmen. They understand the tax write-offs and so forth. They wanted ownership. What do they care about if they can get $3 million for the building and who the tenants of the building are? Do you have another buyer? Oh, I don't. Another buyer has a problem with the tenant. I don't dispute that, Your Honor. There wasn't another buyer. There was a price. Was it reasonable to rely on that price to go to somebody and offer it to them? And once you get an acceptance, yes. Did they market it to other buyers, Mr. Faulkner? No, they did not. And there was no obligation under the law or under the LPA to do so. I liken it to a situation that if you marketed it. I just sold my house. I sold my house and we put it up for a certain price. Somebody came along. I will state on the record, way too low. But somebody came along and offered me a certain purchase price. And then I signed a contract. And three months later somebody comes and says, you know what, I would have paid you a million dollars for your house. What were you doing selling it for less? Could my wife bring a cause of action against me? No, there's no theory. But you never know who's going to come along and offer something more. A general partner has to act based on the moment, based on the information that's in front of them. Third appraisal was done later in the litigation setting, taking into account this. And I think the record is pretty clear. $500,000 went into this. And he didn't even factor that in, didn't address it, didn't even notify or identify that that had taken place. That appraisal is very deficient. But the issue is not comparing. I'm trying to do everything I can to make sure you understand our position is you do not compare the after the fact appraisal to the two that were before. There were actually three. That's my question. And I think that was my original question to you with respect to this appraisal that was done by the plaintiff or the appellant. And there was an issue. Is there not an issue as to when these renovations were made and when they weren't made? I mean, isn't that an issue? In my opinion, no, it's not. It's not an issue at all. The only issue is whether or not he, Mr. Canutti, breached a fiduciary duty by relying on the two independent appraisals that he had at the time of the sale. There was actually a third, which is in the record, but I haven't addressed it today. Mr. Kenney had done one previously, and I think it was for $2.1 million. Then he subsequently did one a couple years later. It was $2.3. So the entirety of the issue here is was Mr. Canutti breaching a duty by taking it for the hire of the ones that he was aware of? Clearly, there is no duty for him to keep going getting more. He could have had $100, and if one show it was worth $4.8 million, like the complaint alleges, which, as I think you know, is totally unsupported, does that mean he breached the fiduciary duty because he didn't go out and get more? No. I'm not saying he breached his fiduciary duty. My question is, you have a summary judgment type of hearing. If you have a material question of fact in a summary judgment hearing, the judge must deny relief to the mover. Regarding fiduciary duty, you'd have to take the position that under the fiduciary duties that Canutti had, he had the right to sell that property to Scott and get two appraisals that said they were fair market value and come back, and that would be the bottom line. If you were a limited partner, you had no right to contest that, and that's your position. In a general type of lawsuit, it seems to me that if you get 9% of $3 million, you're a lot better off than 9% of $2 million, plus the fact that it's a tenant in the building who was in there at a lower rent, a lower price. That's not emphasized as part of the argument, but by providing a lower price to somebody that had an interest with Canutti, it affected the amount of money that the limited partner got on that. I only mentioned that because I probably shouldn't have mentioned it because it's really not an important argument in the case. Your position is that under general fiduciary law, as long as the general manager goes out and gets two independent appraisals, that's sufficient, even though at a summary judgment hearing, there's another higher appraisal pending. That would have benefited, could have benefited the junior partners with more money. Yes, with the exception, our position is the question of whether or not he breached the duty is determined based on the information he had as of that time. There wasn't, Your Honor, I can't stress this enough, there wasn't a $3.6 million appraisal at the time he made the decision to sell. If there was, we'd have a different argument. That's not the facts that were presented. So we don't look at after the fact, could somebody else value this at a higher amount? The question is, at the time, did he act reasonably by utilizing the price that he had? And I want to cut back a little bit of the position that you say, Your Honor. It's not our position because he had to as a matter of law. It's a question of he had to. Was that reasonable? Was he acting reasonably by having to? I think the answer is yes. And that's how the court found and that we would ask you to affirm based on the fact that as of the information he had at that time, he was acting reasonably. And he didn't breach any fiduciary duty. If he didn't breach any fiduciary duty, all 10 counts fall. Very, very briefly, just like I said, there's absolutely no basis for other than harassment, quite honestly. For all the counts against Mr. Kennedy's sons and the other entities that weren't in any way related to Plaintiff Stanton. And certainly I think the record is clear that all such counts as to all such parties should be, dismissal should be affirmed. I thank you for your time. Thank you. Thank you, Mr. Lang. Counsel just relied pretty heavily on the statement that there were no competing buyers. And that's exactly our point, that they foreclosed this by doing this secretly and selling it privately. How do you submit he had a responsibility to you to allow you to open it up to other buyers based upon what? I don't think, Your Honor, I don't think he had the responsibility to allow us to do it. I think he had the responsibility to get the highest price for the benefit of the partnership. Well, didn't he want to get an evaluation? But that's not how we sell property in the real world. We get competition, especially, remember, this is 2007. You've listed on the market, you at least put a for sale sign out, and you let competing buyers bid up the price. Maybe even some of these limited partners could have bid up the price. That's another point of this. Well, what authority is there to say that that has to be done, that a property has to be sold that way? It's the general breach of fiduciary duty, Your Honor. He has to get the highest price for the benefit of the partnership. I mean, he's got the duty of loyalty, not to his sons, but to those of whom he owes a fiduciary duty. So he took the higher of the two appraisals, or he required the sale at the higher of the two appraisals. But, again, that's not how we sell property in the real world. We list it with a broker, and we get competing purchase prices, or bids. And look at the suspicious circumstances of the appraisal. He asked the appraiser for a valuation reduction. Now, can we tell whether dollar for dollar that the appraiser considered that at all? But that, I don't know, but that calls into question the credibility of that, that the seller has the intent to reduce the purchase price. And we know how appraisals work in the real world, too. Are you saying it calls into question the credibility of the individual who evaluated the property? Of the appraisal itself, yes. Because you have the one who's paying his fees and who's engaged this appraiser telling you that I want a valuation reduction. I'm selling this to my sons. We all know that appraisals can vary differently. We've seen the stock valuation disputes. We've seen the property appraisals. And they can value greatly. But what weight do you give to the fact that the bank evaluated it at 2.1? That's a suspicious circumstance to us because the bank came in at 2.1, but they loaned 2.3 million with a mortgage on the building. I realize the point about the personal guarantees and so forth, but there was a $2.3 million mortgage as to a $2.1 million loan. Again, appraisals, we know how they can come in. We've all bought houses. We know how appraisal prices come in. The bank will come in at a certain price. That is not going to be the highest price you can get on the street for a piece of property. It's just – Well, so what if they would have gotten an appraisal on the street at 3 million, and then they've gone to the bank, and the bank says, hey, we're evaluating at 2.1. We're not going to give you 3 million for a 2.1. Well, then they can't buy it. And you can't sell it. Right. Right. Right. What damages are you asking for? Yeah, we're asking for 9% of the difference between our $3.6 million appraisal and the 2.1. You have a trial. Yes. And factual value, and the jury will determine whether or not it was fair market value. Exactly. The jury will determine whether our appraiser was right or their appraisers were right. Now, counsel, wouldn't the damages be to the partnership and not to the plaintiff personally, and shouldn't this have been brought as a derivative suit? Your Honor, that was a belated argument that was brought up. First of all, I think we can't really bring this directly because the general partner was of direct fiduciary duty to the limited partners in addition to the limited partnership. I do think that Mr. Stanton suffered a different injury than the rest of the limited partners because he's a real estate investor. He could have purchased the building. But the main point here, too, is that we are trying to address this issue with our motion for leave to amend. We believe that this defense was waived. The derivative issue was not raised at all at the trial court level at all. And we cite the Greer case. There's the Patrick Development v. Beck case out of this district that talks about standing. It's an affirmed defense that if it's not raised at the trial court, it's waived. It's a matter of justiciability but not jurisdiction. So this court still has a jurisdiction. If it feels that it should be brought as a derivative suit, then we'd be happy to take it. At a trial, if the other partners on the party took a loss of the 9%, which is any increase on the 9% would just go to the client. Correct. Correct. But we're also challenging the fact that he did sell the building at that time. The duty of loyalty requires the general partner to honor the interest of the limited partnership over himself. And he sold the building at that time for personal reasons. That's undisputed. So in conclusion, to wrap this up, we ask that you reverse the trial court's judgment. Can we just say as a matter of law that this transaction was fair by clear and convincing evidence? The counsel stated the standard, did he act reasonably? That is not the standard we're dealing with. We're dealing with genuine issues of material fact and clear and convincing evidence. Thank you. I have one more question on this. The only damage you're requesting is the difference between what the fair market value was or whatever you could prove. And your client would get 9% of the difference between what it sold for and what you could prove as well. Correct. There was also an issue that the general partner used partnership assets to fund his son's defense costs in this litigation. And so we're talking about $40,000 or $50,000. So 9% of that, not a huge amount. So you're also asking that that be returned as the original size of the insurance? Right. They're paying the defense costs of people that weren't even limited partners or general partners or anything to do with this. It's total abuse of power there. And I take it the judge ruled against you on that? Yes. I mean, he didn't specifically address it in his ruling, but he granted full summary judgment on all the issues. Thank you. Thank you. All right. Thank you, Counsel to the Court. We'll take the matter under adjournment.